UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

SASSON PLASTIC SURGERY, LLC

       2:17-cv-01647-SJF-ARL

     Plaintiff,

  -against-      **<u>AMENDED COMPLAINT</u>**

UNITEDHEALTHCARE OF NEW YORK, INC.,  **Plaintiff Demands a Trial by July**

     Defendant.
----------------------------------------------------------------x

  Plaintiff Sasson Plastic Surgery, LLC ("Sasson" or "Plaintiff") by and through its attorneys Tibbetts, Keating & Butler, LLC as and for its amended complaint alleges as follows:

  1.  Plaintiff is a New York corporation consisting of Dr. Homayoun N. Sasson, a hand and plastic and reconstructive surgeon duly licensed to practice medicine in the state of New York who maintains his primary practice in the county of Nassau, New York.

  2.  Upon information and belief, UnitedHealthcare of New York, Inc. ("Defendant") is an insurance corporation duly authorized to do business in the state of New York.

  3.  Plaintiff does not have an in-network contract with Defendant.  Thus, Plaintiff is considered a non-participating provider or out-of-network provider ("non-par provider").  As a non-par provider, Plaintiff may collect its full charges directly from the patients at the time of service and is not required to accept reduced rates for medical procedures it performs.  A non-par provider also may, as Plaintiff did in this case, accept an assignment of benefits in consideration of the health care services provided, which authorizes the non-par provider to submit its claims for services rendered on behalf of a patient directly to the patient's health plan and to receive from that health plan whatever member benefits that patient is entitled to receive under the patient's health plan.

4.     Typically, and as it did with respect to each of its patients at issue in this case, Plaintiff provides medical care to those patients after responding to hospital calls to attend to patients needing emergency care.  Plaintiff is obligated to provide such emergency medical care to the patients without regard to their financial situation and whether or not they have healthcare insurance.

5.     Usually Plaintiff only learns whether the patient has healthcare insurance and what healthcare insurance the patient has after Plaintiff has treated the patient and the patient is in a stable condition.  Typically, either through a patient's admission to the hospital or in follow-up appointments in Plaintiff's office, Plaintiff obtains an assignment of benefits from the patient in consideration for the medical treatment, permitting Plaintiff to send claim forms related to the emergency medical care rendered by Plaintiff to the patient's insurance company or medical benefit provider.  In each instance at issue in this case, Plaintiff received from its patient an assignment of that patient's member benefits under the patient's health plan, which assignment authorized Plaintiff to send to Defendant claim forms for its charges for the medical care provided to the patient-member and authorized the Defendant to remit those patient-member's related health benefits directly to Plaintiff.

6.     During the period from August 1, 2012 through April 2, 2016, Plaintiff provided emergency hand and reconstructive plastic surgery health care services to patients who were covered under health care plans issued or administered by Defendant.

7.     The reasonable charges for the health care services Plaintiff provided to patients covered under health care plans issued or administered by Defendant totals an amount that is not less than $3,886,846.05, of which Plaintiff has only been paid $2,172,926.65 by Defendant. Each of the payments Plaintiff received from Defendant was made by Defendant directly to

2

Plaintiff in accordance with the assignment Plaintiff received from its patient.

8. Defendant has not paid and still owes Plaintiff an amount not less than $2,1,72,926.65 on account of the claim forms submitted by Plaintiff (hereinafter, "Balance Due"). A list of patient names, and the corresponding dates of service, amount of charges, amount of payments and the remaining balance due has been or can be sent separately to Defendant. Said list is not attached to, or filed with this pleading due to HIPAA restrictions.

9. On May 4, 2016, the parties entered into a tolling agreement which tolled the statute of limitation and any policy limitation "with regard to [Plaintiff]'s claims against [Defendant] arising out of the nonpayment or underpayment for services provided by [Plaintiff] to beneficiaries of [Defendant]'s health plans and commt11ucatiorts between [Defendant] and [Plaintiff] 's patients regarding [Plaintiff], as well as any potential counterclaims or defenses that [Defendant] may have against [Plaintiff]".

10. On February 24, 2017, Plaintiff filed a summons with complaint in the New York Supreme Court, County of Nassau.

## AS AND FOR A FIRST CAUSE OF ACTION
### [ERISA – Failure to Abide by Terms of Plan, §502(a)(1)(B)]

11. Plaintiff incorporates and re-alleges paragraphs 1 through 10 as if fully set out herein.

12. In the event any of Plaintiffs' patients who received the medial care at issue in this case was insured under a health plan issued by or for the employer of the patient or patient's family, and the claim for health care provided to that patient is within the scope of ERISA, then Plaintiff asserts a claim for Defendant's violation of Section 502 (a)(1)(B) of ERISA.

13. Plaintiff has standing to pursue ERISA claims on its own behalf and on behalf of its patients by virtue of the assignments of benefits Plaintiff has received from its patients in

3

consideration of Plaintiff's health care services.

14.     At all times relevant to this suit, Defendant acted as a "fiduciary" as such term is defined under 29 U.S.C. §1002(21)(A).

15.     Under ERISA, 29 U.S.C. §1004(a)(1)(D), Defendant is charged with a fiduciary duty to "act in accordance with the documents and instruments governing the plan" in carrying out its role of administering ERISA governed plans.

16.     Defendant's fiduciary duty includes an obligation to pay benefits to its members who are insured under health care plans issued, funded, or administered by Defendant in accordance with the benefit terms of the pertinent ERISA plan.

17.     Although Defendant was obligated to do so, it failed to comply with the applicable plans by unreasonably reducing the payments due to Plaintiff and increasing the liability of Defendant's insureds who received care from Plaintiff.

18.     By making a direct payment to Plaintiff of a portion of Plaintiff's charges for the health care provided to that patient, Defendant has recognized that Plaintiff is to be paid on an out-of-network basis for the emergency health care services provided by Plaintiff to patients covered under Defendant's plans.

19.     Under ERISA, 29 U.S.C. §1022, Defendant is required among other things, to comply with the terms and conditions of its health care plans and to make various disclosures to members.  These required disclosures include accurately setting forth plan terms and explaining the specific reasons for its decisions, and complying with claim procedure regulations.

20.     Upon information and belief, Defendant's health insurance policies at issue in this case provide medical benefits to Defendant's members/insureds for emergency medical services provided by non-par health care providers, including provisions stating that out-of-network

4

providers would be paid the reasonable charges for the emergency services provided to Defendant's insureds.

21.     As a result of the emergency services rendered, Plaintiff is entitled to the entirety of the emergency, out-of-network medical benefits available to its patients pursuant to the terms of Defendant's health insurance policies issued to the patients.

22.     Defendant violated its statutory and plan obligations when it calculated a payment for the claims at issue by substituting its own arbitrary standard, instead of the reasonable charges or other applicable standard within the ERISA plan, with a resulting increase in the patient's liability to the Plaintiff.

23.     The reasonable charges for the services that Plaintiff provided to patients insured by Defendant in an amount that is not less than $3,886,846.05.  Despite Plaintiff having submitted reasonable charges for the emergency health care it provided to Defendant's insureds, Defendant made inappropriate reductions in the payments it did make to Plaintiff, resulting in payments totaling only $1,732,926.65.

24.     Defendant has not paid and still owes Plaintiff the Balance Due.

25.     At all relevant time and for all relevant claims, Plaintiff exhausted all applicable administrative remedies provided in Defendant's health insurance plans at issue in this case.

26.     Defendant violated its legal obligations under ERISA and federal common law each time it made the reductions in the payments made to Plaintiff on the claims at issue.

### AS AND FOR A SECOND CAUSE OF ACTION
### [ERISA – Breach of Fiduciary Duty, 502(a)(3)]

27.     Plaintiff incorporates and re-alleges paragraphs 1 through 26 as if fully set out herein.

28.     In the event any of Plaintiffs' patients who received the medial care at issue in

this case was insured under a health plan issued by or for the employer of the patient or patient's family, and the claim for health care provided to that patient is within the scope of ERISA, then Plaintiff asserts a claim for Defendant's violation of Section 502 (a)(3) of ERISA.

29.     Plaintiff has standing to pursue ERISA claims on its own behalf and on behalf of its patients by virtue of the assignments of benefits Plaintiff has received from its patients in consideration for Plaintiff's health care services.

30.     Upon information and belief, the patient-members relied upon the representations in Defendant's health care plans regarding benefits for emergency out-of-network medical services and/or payments to out-of-network providers.

31.     Upon information and belief, Defendant did not inform patient-members that it was not adhering to the patient-member's health care plan in calculating payments for emergency medical care provided by non-pars, such as Plaintiff, but instead was employing a series of procedures and adjustments that were intentionally designed to reduce the amounts Defendant had to pay Plaintiff and other non-pars providing emergency health care and to increase the patient-member's liability to Plaintiff, often in a substantial amount.

32.      Upon information and belief, Defendant has benefitted from its self-dealing practice of reducing the payment amounts to its members and profiting from the difference between its payments and the much larger reasonable and customary charges.  Under ERISA, Defendant is charged with a fiduciary duty of loyalty in carrying out its role of administering the ERISA plan.  Defendant has failed in this duty which entails performing its "duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries."

33.     Further, a fiduciary such as Defendant must avoid self-dealing or financial

arrangements that benefit it at the expense of its members.  Here, Defendant has flagrantly

violated its fiduciary duty by reducing payments due patients for services provided by Plaintiff to

benefit itself at the expense of the patients.

34.     As the result of Defendant's conduct, Plaintiff is entitled to the unpaid benefits

and interest from the date their patients' claims were originally submitted to Defendant, together

with attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant

pursuant to 29 U.S.C. § 1132(g).

### AS AND FOR A THIRD CAUSE OF ACTION
### [Breach of Plaintiff's Contract with Defendant]

35.     Plaintiff incorporates and re-alleges paragraphs 1 through 10 as if fully set out

herein.

36.     In the event any of Plaintiffs' patients who received the medial care at issue in

this case was insured under a health plan that was not issued by or for the employer of the patient

or the patient's family, or the claim for the balance due for the health care provided to that

patient is not within the scope of ERISA, then Plaintiff asserts a claim for breach of a contract

between Plaintiff and Defendant.

37.     Plaintiff and Defendant through their prior customary practices and business

dealings have agreed that when Plaintiff provides emergency health care services to patients

insured under a policy issued, funded or administered by Defendant than Defendant will pay

Plaintiff the amount of benefits the patient is entitled to receive under its insurance plan with

Defendant with respect to those health care services.

38.     Defendant acknowledged and agreed that Plaintiff should be compensated by

Defendant as a non-par provider for emergency health care services provided by Plaintiff to

Defendant's insureds.

7

39.     The reasonable charges for the emergency health care services that were rendered to the insureds of Defendant totals an amount not less than $3,886,846.05, but Defendant has only paid $1,732,926.65 to Plaintiff on account of those services.

40.     Defendant has not paid and still owes Plaintiff an amount not less than $2,172,926.65.

41.     Defendant's failure to pay Plaintiff the amount that remains outstanding on its charges constitutes a breach of the agreement between Defendant and Plaintiff.

42.     As a result of Defendant's breach of contract, Plaintiff has sustained damages in an amount to be determined at trial but which is not less than the Balance Due.

## AS AND FOR A FOURTH CAUSE OF ACTION
### [Breach of Patient Contracts with Defendant]

43.     Plaintiff incorporates and re-alleges paragraphs 1 through 10 as if fully set out herein.

44.     In the event any of Plaintiffs' patients who received the medial care at issue in this case was insured under a health plan that was not issued by or for the employer of the patient or the patient's family, or the claim for the balance due for the health care provided to that patient is not within the scope of ERISA, then Plaintiff asserts a claim for breach of a contract between Plaintiff's patient and Defendant.

45.     At all relevant time periods herein, Defendant issued health care insurance policy contracts to Plaintiff's patients who received the emergency medical care at issue in this case.

46.      Each insurance policy at issue in this case contains contractual provisions for health care benefits Defendant is required to provide to its members for emergency medical care services rendered by non-participating providers, such as Plaintiff.

47.     Upon information and belief, each of Defendant's health care plans at issue in this

case states that the out-of-network doctors providing emergency health care services should be paid based on reasonable charges for those emergency services.

48.     As a result of assignments of benefits that Plaintiff received from the applicable patients in consideration of Plaintiff's health care services, Plaintiff has standing to assert against Defendant its patients' claims that Defendant breached its contract with the patient by not paying Plaintiff the proper amount under the applicable health care plan for the emergency medical care provided by Plaintiff.

49.     Defendant had knowledge that Plaintiff provided emergency medical treatment to its insureds, thereby conferring benefits upon the Defendant by virtue of providing emergency medical treatment to its insureds.

50.     Defendant accepted the benefits conferred upon it by Plaintiff.

51.     As a result of the assignments it received from its patients, Plaintiff was entitled to receive the full amount of benefits under those plans, which upon information are the reasonable charges for those emergency services, or an amount not less than $3,886,846.05.

52.     Defendant has failed to pay Plaintiff the entire amount of health care benefits its patients are entitled to under the provisions in their health care plans with Defendant governing emergency, out-of-network medical care.

53.     Plaintiff and its patients have fully performed their obligations and conditions precedent under Defendant's applicable health care plans insurance policies, including exhausting all applicable administrative remedies.

54.     Nevertheless, Defendant only has paid Plaintiff the amount of $1,732,926.65 on account for the emergency medical care Plaintiff provided to Defendants insureds, leaving the Balance Due.

55.     Defendant's failure to pay to Plaintiff the full amount of benefits due under its members' healthcare plans, constitutes a breach of Defendant's contracts with Plaintiff's assignor-patients and is a breach of Plaintiff's third-party beneficiary rights under those contracts.

56.     As a result of Defendant's breach of its insurance contacts with Plaintiff's assignor-patients, and Defendant's breach of Plaintiff's third-party beneficiary rights under its patients' insurance contracts with Defendant, Plaintiff has been damaged in an amount to be determined at trial but which is not less than the Balance Due.

## AS AND FOR A FIFTH CAUSE OF ACTION
### [Third Party Beneficiary-Breach of Contract Claim]

57.     Plaintiff incorporates and re-alleges paragraphs 1 through 10 as if fully set out herein.

58.     In the event any of Plaintiffs' patients who received the medial care at issue in this case was insured under a health plan that was not issued by or for the employer of the patient or the patient's family, or the claim for the balance due for the health care provided to that patient is not within the scope of ERISA, then Plaintiff asserts a claim for breach of a contract regarding as a third-party beneficiary of the contracts between Plaintiff's patients and Defendant.

59.     At all relevant time periods herein, Defendant issued health care insurance policy contracts to Plaintiff's patients who received the emergency medical care at issue in this case.

60.     Each insurance policy at issue in this case contains contractual provisions for health care benefits Defendant is required to provide to its members for emergency medical care services rendered by non-participating providers, such as Plaintiff.

61.      Upon information and belief, each of Defendant's health care plans at issue in this case states that the out-of-network doctors providing emergency health care services should

be paid based on reasonable charges for those emergency services.

62.     At all times relevant herein, Plaintiff was the intended beneficiary of the emergency out-of-network health care benefits within the health care insurance policies issued by Defendant.

63.     Defendant had knowledge that Plaintiff provided emergency medical treatment to its insureds, thereby conferring benefits upon the Defendant by virtue of providing emergency medical treatment to its insureds.

64.     Defendant accepted the benefits conferred.

65.     As a result of its status as a third party beneficiary of the emergency provider provisions of tis patient's health care plans with Defendant, Plaintiff was entitled to receive the full amount of benefits under those plans, which upon information are the reasonable charges for those emergency services, or an amount not less than $3,886,846.05.

66.     Defendant has failed to pay Plaintiff the entire amount of health care benefits its patients are entitled to under the provisions in their health care plans with Defendant governing emergency, out-of-network medical care.

67.     Plaintiff and its patients have fully performed their obligations and conditions precedent under Defendant's applicable health care plans insurance policies, including exhausting all applicable administrative remedies.

68.     Nevertheless, Defendant only has paid Plaintiff the amount of $1,732,926.65 on account for the emergency medical care Plaintiff provided to Defendants insureds, leaving the Balance Due.

69.     As a result of Defendant's breach of Plaintiff's third-party beneficiary rights under its patients' insurance contracts with Defendant, Plaintiff has been damaged in an amount

to be determined at trial but which is not less than the Balance Due.

## AS AND FOR A SIXTH CAUSE OF ACTION
### [Unjust Enrichment]

70.     Plaintiff incorporates and re-alleges paragraphs 1 through 3, and paragraphs 8-10 as if fully set out herein.

71.     In the event any of Plaintiffs' patients who received the medial care at issue in this case was insured under a health plan that was not issued by or for the employer of the patient or the patient's family, or the claim for the balance due for the health care provided to that patient is not within the scope of ERISA, and there is no contract between Plaintiff and Defendant covering the subject of the emergency health care provided to Defendant's insureds, than Plaintiff asserts a claim for unjust enrichment.

72.     Plaintiff provided emergency medical services to patients insured by Defendant or Defendant's health plans, in good faith without entering a written contractual relationship with Defendant.

73.     Defendant had knowledge that Plaintiff provided emergency medical treatment to its insureds, thereby conferring benefits upon the Defendant by virtue of providing emergency medical treatment to its insureds.

74.     Defendant accepted the benefits conferred and acknowledged that Plaintiff should be reimbursed for its emergency medical services as a non-par.

75.     The reasonable charges for the services that were rendered to the insureds of Defendant is in an amount no less than $3,886,846.05.

76.     Defendant has only paid Plaintiff $1,732,926.65 on account of the claims submitted for emergency medical care provided to Defendant's insureds.

77.     Defendant has not paid and still owes Plaintiff an amount not less than the

Balance Due.

78.    Plaintiff has made demand upon Defendant for payment of the Balance Due and with the expectation that said amount would be paid.

79.    As a consequence, Defendant has been unjustly enriched by the retention of the Balance Due.

80.    Plaintiff has been damaged in an amount not less than the Balance Due.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**[Quantum Meruit]**

81.    Plaintiff incorporates and re-alleges paragraphs 1 through 3, and paragraphs 8-10 as if fully set out herein.

82.    In the event any of Plaintiffs' patients who received the medial care at issue in this case was insured under a health plan that was not issued by or for the employer of the patient or the patient's family, or the claim for the balance due for the health care provided to that patient is not within the scope of ERISA, and there is no contract between Plaintiff and Defendant covering the subject of the emergency health care provided to Defendant's insureds, than Plaintiff asserts a claim for quantum meruit.

83.    Plaintiff provided emergency medical services to patients insured by Defendant without entering a written contractual relationship with Defendant.

84.    Defendant had knowledge that Plaintiff provided emergency medical treatment to its insureds, thereby conferring benefits upon the Defendant by virtue of providing emergency medical treatment to its insureds.

85.    Defendant accepted the benefits conferred and acknowledged that Plaintiff should be reimbursed for its emergency medical services as a non-par.

86.    The reasonable charges for the services that were rendered to the insureds of

Defendant is in an amount no less than $3,886,846.05 of which only $1,732,926.65 has been paid by Defendant.

87.     Defendant has not paid and still owes Plaintiff an amount no less than the Balance Due.

88.     Plaintiff is entitled to receive compensation for its work and labor in accordance with New York law.

89.     Defendant wrongfully withheld compensation for the work and labor performed despite the proper submission of claims by Plaintiff.

90.     The circumstances are such that it is inequitable for Defendant to retain the benefits without paying the fair rate for such services.

91.     The Plaintiff has been damaged in an amount no less than the Balance Due.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### [Account Stated]

92.     Plaintiff incorporates and re-alleges paragraphs 1 through 10 as if fully set out herein.

93.     In the event any of Plaintiffs' patients who received the medial care at issue in this case was insured under a health plan that was not issued by or for the employer of the patient or the patient's family, or the claim for the balance due for the health care provided to that patient is not within the scope of ERISA, then Plaintiff asserts a claim for an account stated.

94.     Plaintiff received assignments of benefits from the applicable patients in order to send the related invoices to Defendant and for Defendant to remit the member's related health benefits to Defendant.

95.     Upon information and belief, Defendant's health insurance policies at issue in this case provide medical benefits to Defendant's members/insureds for emergency medical services

14

provided by non-par health care providers.

96.     Upon information and belief, Defendant's medical plans state that the out-of-network doctors should be paid based on reasonable charges for the emergency services provided by Plaintiff.

97.     As a result of the emergency services rendered, Plaintiff is entitled to the entirety of the emergency, out-of-network medical benefits available to its patients in accord with Defendant's health insurance policies issued to the patients.

98.     Within a reasonable time of providing such medical services, Plaintiff sent requests to Defendant for payment to for the medical services provided in an amount not less than $3,886,846.05.

99.     Defendant paid only $1,732,926.65 of the $3,886,846.05 to Plaintiff without providing adequate written notice of any objection as to the remaining balance.

100.    As a result, an account was stated between Plaintiff and Defendant which showed a balance of no less than $2,172,926.65 due and owing by Defendant to plaintiff.

101.    Plaintiff has been damaged in an amount no less than $2,172,926.65.

### AS AND FOR THE NINTH CAUSE OF ACTION
### [Conversion]

102.    Plaintiff incorporates and re-alleges paragraphs 1 through 10 as if fully set out herein.

103.    Plaintiff received assignments of benefits from the applicable patients in consideration for Plaintiff's health care services in order to send the related invoices to Defendant and for Defendant to remit the member's related health benefits to Defendant.  As such, the patients assigned their right to emergency out of network benefits to Plaintiff.

104.    Defendant's members pay Defendant premiums for the purpose of covering their medical services, including emergency medical services provided by nonparticipating providers such as Plaintiff.

105.    In receiving the premiums from its insured and processing and determining claims, Defendant has control and dominion over the funds that would or could be used as benefits for its insureds.

106.    Despite Defendant's insureds incurring charges for emergency medical services provided by the Plaintiff in an amount no less than $3,886,846.05, Defendant only paid $1,732,629.65 of the $3,886,846.05 and took back an additional $18,710.25 from the payments made, leaving the Balance Due.

107.    Defendant has converted the funds in its possession, which in this case are intended for the payment of emergency medical service provided by Plaintiff to Defendant's members, for Defendant's own use.

108.    Plaintiff has been damaged by the conversion by the Defendant of the funds intended for the payment of medical services for the Defendant's members.

## AS AND FOR A TENTH CAUSE OF ACTION
### [Defamation]

109.    Plaintiff incorporates and re-alleges paragraphs 1 through 10 as if fully set forth herein.

110.    In response to claims for the emergency medical services rendered by Plaintiff, Defendant issued Explanation of Benefits forms ("EOBs") to patients, or otherwise communicated with patients and/or other third parties about Plaintiff's claims.  In these communications, Defendant alleged that Dr. Sasson misrepresented the services that he provided,

16

altered documents, replaced the attending emergency room physicians' names with his name on hospital admissions sheets, or committed other fraud.

111.    On August 14, 2013, Plaintiff sent Defendant a correspondence memorializing a communication between their patient, John Doe 1, and Defendant.[1]  Defendant told the patient that it was not paying Plaintiff because Dr. Sasson was under investigation for fraud and misrepresentation.  Plaintiff then received a call from Defendant (specifically, a representative named Frank) indicating that Plaintiff cannot balance bill said patient.  Frank then called the mother of said patient and advised her not to pay Plaintiff or take Plaintiff's calls.

112.    On August 9, 2013, Defendant sent a letter to Plaintiff's patient, John Doe 2, regarding services provided by Plaintiff on September 6, 2012.  In said letter, Defendant indicated that "charges cannot be considered because there is evidence that services have been misrepresented."

113.    On August 9, 2013, Defendant wrote a letter to Plaintiff's patient, John Doe 3, regarding services provided by Plaintiff.  In said letter, Defendant indicated that "there is evidence that the service has been misrepresented."

114.    On August 14, 2013, Plaintiff sent Defendant a letter memorializing that a patient, John Doe 4, was told by Defendant that services provided to the patient from Plaintiff was not being paid due to "Dr. Sasson being under investigation for fraud and misrepresentation".  A representative of Defendant, Raymond, called Plaintiff on August 12, 2012 stating the Plaintiff could not bill this patient because Dr. Sasson committed fraud.  Raymond then contacted the patient and advised not to call Plaintiff's office or take any calls from Plaintiff's office.

---

[1] Plaintiff will not include the patient's exact names in this pleading due to HIPAA restraints. Plaintiff will supply these names at a later date.

115.    On August 26, 2013, Defendant wrote a letter to the parents of patient, John Doe 5, regarding services provided by Plaintiff on December 24, 2012.  In said correspondence, Defendant indicated that "previous history denotes misrepresentation" with respect to the ER visit and wound repair.

116.    On August 26, 2013, a patient, John Doe 6, called Defendant to follow up on the non-payment of the services provided by Plaintiff.  A representative of Defendant told this patient that "Dr. Sasson has committed fraud."  Plaintiff memorialized this in a letter to Defendant dated September 4, 2013.

117.    On September 26, 2013, Defendant sent a letter to the parent of patient, John Doe 7, regarding services that were billed by Plaintiff on December 26, 2012.  In said letter, Defendant indicated that it could not consider payment because "there is evidence that the services billed have been misrepresented."

118.    On October 2, 2013, Defendant wrote a letter to patient John Doe 8 regarding services provided by Plaintiff on December 21, 2012.  In the letter, Defendant indicated that misrepresentation of services in Plaintiff's bill resulted in the denial of payment for those services.  In a letter to Plaintiff dated September 20, 2013 regarding the same patient but for services on February 6, 2013, Defendant writes that "there is a notable alteration of documents submitted by Dr. Sasson.  Services are considered misrepresented and are not payable."  Patient A.M. received a copy of Defendant's February 6, 2013 letter.

119.    On June 26, 2013, Defendant wrote to patient John Doe 9 regarding the services provided by Plaintiff on December 21, 2012.  In that letter, Defendant writes that Plaintiff's bill cannot be considered because there is evidence that the services billed have been misrepresented; and that the hospital records do not document that the patient was treated by Plaintiff.

18

120.    On July 25, 2013, Defendant wrote to Plaintiff regarding its patient, John Doe 10, and services provided on November 22, 2012 by Plaintiff.  In the letter, Defendant states that "charges cannot be considered because there is evidence that services have been misrepresented."  Defendant also writes that a document "has been altered by crossing of Franklin Hospital's name and hand-writing in Dr. Sasson's name… Any alteration of documentation is considered misrepresentation of services and is not payable." Upon information and belief, Defendant sent a similar communication to the patient.

121.    On July 29, 2013, Defendant wrote to the parent of Plaintiff's patient, John Doe 11, regarding services provided on December 2, 2012 by Plaintiff.  In the letter, Defendant stated that "there is evidence that the services billed have been misrepresented.  The hospital records document that Emergency Room services were performed by the hospital attending Emergency Room physician."

122.    On August 8, 2013, Defendant wrote to Plaintiff's patient, John Doe 12, regarding services provided on November 22, 2012 by Plaintiff. In the letter, Defendant states that "there is evidence that the services billed have been misrepresented."  In addition, Defendant writes that "the hospital records do not support that Dr. Sasson performed an actual Emergency Room visit."

123.    On September 16, 2013, Defendant wrote to Plaintiff regarding patient, John Doe 13, regarding services provided February 6, 2013 by Plaintiff.  In the letter, Defendant indicated that "charges cannot be considered because there is evidence that services have been misrepresented.  In addition, Defendant states "new hospital records were submitted by the patient/member.  These records do not support that any surgery was performed by Dr. Sasson on 11/21/2012.  There is notable alteration of documents submitted by Dr. Sasson.  Services are

considered misrepresented and are not payable.  As the initial service of 12/21/2012 was not reimbursed, the subsequent care of the injury is not supported."  Upon information and belief, Defendant sent a similar communication to the patient.

124.  On October 2, 2013, Defendant wrote a letter to Plaintiff's patient, John Doe 14, regarding services provided on December 21, 2013 and February 6, 2013 by Plaintiff.  In the letter, Defendant states that "the hospital records do not document that you were seen by Dr. Sasson when you initially presented to the Emergency Room", and that "misrepresentation of services results in our denial of expenses."

125.  On February 21, 2014, Defendant wrote a letter to Plaintiff's patient, John Doe 15, regarding services provided on January 24, 2013 by Plaintiff.  In the letter and with respect to a particular CPT code, defendant wrote that "no benefits are available due to the misrepresentation of the nature and extent of injury that preceded this service or charge."

126.  On June 12, 2014, Defendant issued a Remittance Advice to Plaintiff indicating that services provided to Plaintiff's patient, John Doe 16, on April 14, 2014 were "denied per Special Investigations Unit (SUI) for fraud abuse."  Upon information and belief, Defendant sent a similar written communication to the patient.

127.  On June 12, 2014, Defendant issued a Remittance Advice to Plaintiff indicating that services provided to Plaintiff's patient, John Doe 17, on April 14, 2014 were "denied per Special Investigations Unit (SUI) for fraud abuse."  Upon information and belief, Defendant sent a similar written communication to the patient.  Defendant would later send another Remittance Advice to Plaintiff on February 5, 2016 for the same patient and DOS indicating that the payment for the "charges cannot be considered because services billed are not documented as

performed."  Upon information and belief, Defendant sent a similar written communication to the patient.

128.    On June 13, 2014, Defendant wrote a letter to the parent of Plaintiff's patient, John Doe 18, regarding services provided on October 2, 2012.  In the letter, Defendant states that "the fact that Dr. Sasson indicated that he removed plastic from another player's helmet does not mean that foreign bodies were documented sufficiently for our determination of benefits." Defendant also states that "it is our determination that there is no claim and it is our belief that the patient should not be responsible for payment to a doctor for undocumented work."

129.    On or about July 3, 2014, upon information and belief, Defendant sent an EOB or other communication to patients John Doe 19 (DOS- 5/28/2014), John Doe 20 (DOS-5/18/2014), John Doe 21 (DOS- 5/10/2014), and John Doe 22 (DOS- 4/12/2014), initially outlining payments or denials for services provided to said patients by Plaintiff.  In said communications, Defendant indicated that a "claim [was] denied per Special Investigations Unit (SIU) for fraud/abuse."

130.    On July 15, 2014, Defendant issued a Remittance Advice to Plaintiff indicating that services provided to Plaintiff's patient, John Doe 23., on May 23, 2014 were "denied per Special Investigations Unit (SUI) for fraud abuse."  Upon information and belief, Defendant sent a similar written communication to the patient.

131.    On or about December 13, 2014, Plaintiff wrote a letter to Defendant memorializing a conversation that it had with a patient, John Doe 24, about said patient's telephone call with Defendant.  In that telephone call, Defendant told the patient that Plaintiff was not being paid because it was under investigation.  Defendant's representative, Brian, also said that "Dr. Sasson is red flagged and even if he removed a splinter we will ask for every single

document to make sure he actually performed the services.  Otherwise we would just pay without asking for any documentation like all other doctors."

132.    On or about December 17, 2014, Plaintiff wrote a letter to Defendant memorializing a conversation that it had with a patient, John Doe 25, about said patient's communication with Defendant.  In that communication, Defendant told the patient that Plaintiff was under investigation and red flagged.

133.    On January 6, 2015, Defendant sent Plaintiff a letter indicating that its claims for services provided to patient John Doe 26 (DOS- 7/28/2014) were denied "because there is evidence that services have been misrepresented."  Upon information and belief, Defendant sent a similar communication to the patient.

134.    On January 22, 2015, Defendant issued a Remittance Advice to Plaintiff indicating a service that Plaintiff provided to its patient, John Doe 27, on November 17, 2014 was "denied per Special Investigations Unit (SUI) for fraud abuse." In the same communication, Defendant indicated that another charge "cannot be considered because services billed are not documented as performed."  Upon information and belief, Defendant sent a similar written communication to the patient.

135.    On January 24, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 28, regarding services provided on August 30, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

136.    On January 24, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 29, regarding services provided on August 31, 2014 by Plaintiff.  In the letter, Defendant upheld the

previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

137.    On January 24, 2015, Defendant sent a letter to the parents of Plaintiff's patient, John Doe 30, regarding services provided on July 24, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

138.    On January 24, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 31, regarding services provided on November 17, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

139.    On January 24, 2015, Defendant sent a letter to the parents of Plaintiff's patient, John Doe 32, regarding services provided on September 4, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

140.    On March 11, 2015, Defendant sent a letter to the parents of Plaintiff's patient, John Doe 32, regarding services provided on August 15, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

141.    On March 18, 2015, Defendant sent a letter to the parents of Plaintiff's patient, John Doe 33, regarding services provided on October 16, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

142.    On April 18, 2015, Defendant sent a letter to the parents of Plaintiff's patient, John Doe 34, regarding services provided on October 26, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

143.    On April 20, 2015, Defendant sent a letter to the parents of Plaintiff's patient, John Doe 35, regarding services provided on November 16, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

144.    On April 20, 2015, Defendant sent a letter to the parents of Plaintiff's patient, John Doe 36, regarding services provided on November 21, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

145.    On April 30, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 37, regarding services provided on December 6, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance

24

policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

146.     On May 26, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 38, regarding services provided on April 11, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

147.     On May 14, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 39, regarding services provided on August 20, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

148.     On June 17, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 40, regarding services provided on April 15, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

149.     On June 19, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 41, regarding services provided on November 4, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

150.     On July 18, 2015, Plaintiff wrote a letter to Plaintiff's patient, John Doe 42, indicating that the patient's claim (DOS- November 5, 2014) was processed correctly, noting a provision that is in the applicable health insurance policy (upon information and belief) entitled "Fraud and Abusive billing". The applicable language cited states that a nonparticipating provider may balance bill a patient for services "that are determined to be not payable as a result of a reasonable belief of fraud or other intentional misconduct or abusive billing."

151.     On July 20, 2015, Plaintiff wrote a letter to the parents of Plaintiff's patient, John Doe 43, indicating that the patient's claim (DOS- March 2, 2015) was processed correctly, noting a provision that is in the applicable health insurance policy entitled "Fraud and Abusive billing". The applicable language cited states that a nonparticipating provider may balance bill a patient for services "that are determined to be not payable as a result of a reasonable belief of fraud or other intentional misconduct or abusive billing."

152.     On July 20, 2015, Defendant sent a letter to the parents of Plaintiff's patient, John Doe 44, regarding services provided on March 20, 2015 by Plaintiff. In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policy indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

153.     On July 27, 2015, Plaintiff wrote a letter to Defendant memorializing a conversation with its patient, John Doe 45, wherein the patient was notified that Defendant has not paid for Plaintiff's services because "Dr. Sasson being under investigation", the "claim [was] denied per special investigations unit for fraud/abuse", and other defamatory statements.

154.     On September 29, 2015, Defendant wrote a letter to Plaintiff's patient, John Doe 46, indicating that the patient's claim (DOS- March 12, 2015) was processed correctly, noting a

provision that is in the applicable health insurance policy (upon information and belief) entitled "Fraud and Abusive billing". The applicable language cited states that a nonparticipating provider may balance bill a patient for services "that are determined to be not payable as a result of a reasonable belief of fraud or other intentional misconduct or abusive billing."

155. On September 29, 2015, Plaintiff wrote a letter to Plaintiff's patient, John Doe 47, indicating that the patient's claim (DOS- February 8, 2015) was processed correctly, noting a provision that is in the applicable health insurance policy entitled "Fraud and Abusive billing". The applicable language cited states that a nonparticipating provider may balance bill a patient for services "that are determined to be not payable as a result of a reasonable belief of fraud or other intentional misconduct or abusive billing."

156. On October 2, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 48, regarding services provided on March 1, 2015 by Plaintiff. In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

157. On October 7, 2015, Defendant sent a letter to Plaintiff's patient, John Doe 49, regarding services provided on February 28, 2015 by Plaintiff. In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

158. On March 23, 2016, Defendant wrote a letter to patient John Doe 50 regarding the patient's responsibility for the difference of Plaintiff's reasonable charges and Defendant's

payment (if any).  In the letter, Defendant indicated that there was no record properly identifying and supporting the services claimed.

159.    On July 16, 2016, Defendant sent a letter to Plaintiff's patient, John Doe 51, regarding services provided on September 16, 2014 by Plaintiff.  In the letter, Defendant upheld the previous determination(s) and cited to a provision within the applicable health insurance policies indicating that audits of a provider "may result in non-payment to the provider for these unusual or fraudulent practices".

160.    On September 14, 2016, a wife of a patient (upon information and belief patient John Doe 52) wrote a negative yelp review, calling Plaintiff a thief and indicating that the insurance company (i.e. Defendant) refused to pay Plaintiff because "he has multiple audits against him for high claims."

161.    Upon information and belief, Defendant has made other statements or sent other communications of the like outlined above to other patients of Plaintiff, and other third parties, defaming Plaintiff with allegations that misrepresented the services that it provided, altered documents, or committed other fraud.

162.    Additionally, in telephone calls with its insureds/Plaintiff's patients, Defendant made claims that Plaintiff made misrepresentations and committed fraud on his invoices.

163.    Upon information and belief, Defendant has made similar defamatory comments or communications (written or verbal) to patients alleging Plaintiff committed fraud or misrepresented his services.

164.    Plaintiff committed no fraud or other misrepresentation with respect to its services of its patients or to the related billing.  Any investigation of Plaintiff for fraud,

28

misrepresentations, or irregular billing lacked any basis in fact and is a sham to support

Defendant's improper efforts to avoid paying Plaintiff.

165.    Plaintiff did not replace attending room physicians' names with his name on

hospital admission sheets nor did he commit fraud or make misrepresentations on invoices to

Defendant. Defendant's statements outlined above are false.

166.    Defendant's statements as outlined above are false.

167.    Defendant made the aforementioned false statements to third parties without

privilege, authorization from Plaintiff, or other justification.

168.    Defendant's fault with respect to its defamatory statements amounts to at least

negligence.

169.    Defendant's defamatory statements caused special damages, such as but not

including the Balance Due.

170.    Defendant's defamatory statements as outlined above constitute defamation per

se.

171.    Defendant's defamatory statements as outlined above constitute trade defamation

172.    These false allegations by Defendant injured Plaintiff, his reputation, and his

relationship with his patients, some of which have failed to come in for necessary follow-up

medical appointments due to Defendant's false claims.

173.    As a result of Defendant defamatory claims as outlined above against Plaintiff,

Plaintiff has been damaged in an amount to of the Balance Due.

## AS AND FOR A ELEVENTH CAUSE OF ACTION
### [Tortious Interference with a Contract]

174.    Plaintiff incorporates and re-alleges paragraphs 1 through 10, and paragraphs 108

through 173 as if fully set forth herein.

175.    As a non-par provider, Plaintiff may collect its full charges directly from its patients at the time of service and is not required to accept reduced rates from the patients' health care insurance for medical procedures it performs.  A non-par provider also may, as Plaintiff did in this case, accept an assignment of benefits, which authorizes the non-par provider to submit its claims for services rendered on behalf of a patient directly to the patient's health plan and to receive from that health plan whatever member benefits that patient is entitled to receive under the patient's health plan.

176.    When Plaintiff bills its patient for the difference between its charges and the amount paid by the patient's health insurance, that is called a "balance bill".  A "balance bill" is the patient's responsibility to pay to Plaintiff.

177.    Defendant knows that Plaintiff is a nonpar provider and knows that balance bills issued to a patient is that patient's responsibility.

178.    In communications with Plaintiff's patients and other third parties, Defendant has advised Plaintiff's patients not to pay Plaintiff's charges or the balance bills.

179.    On August 14, 2013, Plaintiff sent Defendant a correspondence memorializing a conversation with their patient, John Doe 53, regarding the patient's call with Defendant. Defendant told the patient that it was not paying Plaintiff because Dr. Sasson was under investigation for fraud and misrepresentation.  Plaintiff then received a call from Defendant (specifically, a representative named Frank) indicating that Plaintiff cannot balance bill said patient.  Frank then called the mother of said patient and advised her not to pay Plaintiff or take Plaintiff's calls.

180.    On January 17, 2014, Defendant sent a letter to New York Attorney General's office regarding Plaintiff's patient, John Doe 54, and provided to the patient on December 2,

2012.  In the letter, Defendant writes that "it is our determination that there is no claim and the patient should not be liable to Dr. Sasson for undocumented work..."

181.     On June 6, 2014, Defendant sent a letter to Plaintiff's patient, John Doe 55, regarding services provided on September 20, 2012.  In the letter, Defendant indicates that there is no record identifying or supporting the services claimed and billed, and further states that "the patient should not be responsible for payment to a doctor for undocumented work."

182.     On June 13, 2014, Defendant wrote a letter to the parent of Plaintiff's patient, John Doe 56, regarding services provided on October 2, 2012.  In the letter, Defendant states that "the fact that Dr. Sasson indicated that he removed plastic from another player's helmet does not mean that foreign bodies were documented sufficiently for our determination of benefits." Defendant also states that "it is our determination that there is no claim and it is our belief that the patient should not be responsible for payment to a doctor for undocumented work."

183.     On June 25, 2014, Defendant sent a letter to the parent of Plaintiff's patient, John Doe 57, regarding services provided by Plaintiff.  In the letter, Defendant indicates that there is no record identifying or supporting the services claimed and billed, and further states that "the patient should not be responsible for payment to a doctor for undocumented work."

184.     On July 7, 2014, Defendant sent a letter to the parent of Plaintiff's patient, John Doe 58, regarding services provided by Plaintiff.  In the letter, Defendant indicates that there is no record identifying or supporting the services claimed and billed, and further states that "the patient should not be responsible for payment to a doctor for undocumented work."

185.     On July 8, 2014, Defendant sent a letter to the parent of Plaintiff's patient, John Doe 59, regarding services provided on December 2, 2012.  In the letter, Defendant indicates that

there is no record identifying or supporting the services claimed and billed, and further states that "the patient should not be responsible for payment to a doctor for undocumented work."

186.    On September 3, 2014, Defendant sent a letter to Plaintiff's patient, John Doe 60, regarding services provided on December 21, 2012.  In the letter, Defendant indicates that there is no record identifying or supporting the services claimed and billed, and further states that "the patient should not be responsible for payment to a doctor for undocumented work."

187.    On October 12, 2015, Defendant wrote a letter to the parents of patient John Doe 61 indicating that Plaintiff charges a higher amount than what is normally charged and accepted, and advising the parents not to pay Plaintiff.

188.    On March 23, 2016, Defendant wrote a letter to patient John Doe 62 regarding the patient's responsibility for the difference of Plaintiff's reasonable charges and Defendant's payment (if any).  In the letter, Defendant indicated that there was no record properly identifying and supporting the services claimed.

189.    Upon information and belief, Defendant has made other statements or sent other communications of the like outlined above to other patients of Plaintiff, and other third parties stating that the patients did not have to pay Plaintiff despite the patients' legal obligations to do so.

190.    Plaintiff has adequately supplied the necessary records and/or supporting documentation for its services.  Defendant's assertion to the contrary is false and merely a pretense to unjustifiably advise patients to not pay Plaintiff's charges or balance bills.

191.    Upon information and belief, Defendant's interference is part of its overall scheme to vex, impair, and damage Plaintiff as also evidenced in the various defamation claims outlined above.

32

192.    Numerous patients of Plaintiff have not paid Plaintiff's charges or balance bills. Upon information and belief, the nonpayment is a proximate cause of Defendant's unjustifiable interference.

193.    As a result of Defendant interference as outlined above, Plaintiff has been damaged in an amount to be determined at trial, but not less than the Balance Due.

WHEREFORE the Plaintiff respectfully requests judgment against the Defendant as follows:

a.  On Plaintiff's first case of action, in an amount to be determined at trial, but which is not less than $2,172,926.65;

b.  On Plaintiff's second cause of action, in an amount to be determined at trial, but which is not less than $2,172,926.65;

c.  On Plaintiff's third cause of action, in an amount to be determined at trial, but which is not less than $2,172,926.65;

d.  On Plaintiff's fourth cause of action, in an amount to be determined at trial, but which is not less than $2,172,926.65;

e.  On Plaintiff's fifth cause of action, in an amount to be determined at trial, but which is not less than $2,154,216.40;

f.  On Plaintiff's sixth cause of action, in an amount to be determined at trial, but which is not less than $2,154,216.40;

g.  On Plaintiff's seventh cause of action, in an amount to be determined at trial, but which is not less than $2,154,216.40;

h.  On Plaintiff's eighth cause of action, in an amount to be determined at trial, but which is not less than $2,154,216.40;

i.  On Plaintiff's ninth cause of action, in an amount to be determined at trial.;

j.  On Plaintiff's tenth cause of action, in an amount to be determined at trial, but which is not less than $2,154,216.40;

k. On Plaintiff's eleventh cause of action in an amount to be determined at trial, but which is not less than $2,154,216.40;

l. Attorney's fees;

m. Punitive damages;

n. Special damages;

o. The cost and disbursements of this action; and

p. Such further and other relief as the court may deem to be just and proper.

Dated:      New York, New York
July 7, 2017

TIBBETTS, KEATING & BUTLER, LLC

_____
Thomas B. Noonan
*Attorney for Plaintiff*
Nine East 45th Street 9th Floor
New York, New York 10017
(212) 629-4119

To via ECF:

Michael H. Bernstein, Esq.
Jovana Vujovic, Esq.
Sedgwick
225 Liberty Street, 28th Floor
New York, NY 10281

34